UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

United States of America

    v.                                    Civil No. 06-CV-211-JD
                                          Opinion No. 2008 DNH 186

Nancy R. Berry, Individually and
as Fiduciary for the Estate of
James A. Berry

O R D E R

     The United States brought an action against Nancy R. Berry pursuant to 26 U.S.C. § 7405 to recover a tax refund for the 2000 tax year of $204,695.48, on the ground that the refund was issued in error. Berry's refund request claimed that a stock transaction resulting in a capital gain was incorrectly valued on her 2000 tax return. The United States moves for summary judgment, contending that Berry's original 2000 tax return correctly reported the stock value. Berry objects, arguing that she is not bound by the valuation agreed upon during the transaction and that summary judgment is inappropriate because factual issues exist such as the actual value of the stock she received. The United States filed a reply to the objection.

Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment must present competent evidence of record that shows a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). All reasonable inferences and all credibility issues are resolved in favor of the nonmoving party. See id. at 255.

At the outset, the court notes that where the moving party bears the burden of proof, it will prevail on summary judgment only if the evidence submitted is conclusive. EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de P.R., 279 F.3d 49, 55 (1st Cir. 2002). In such a case, the court will grant the motion only if "(1) the moving party initially produces enough supportive evidence to entitle the movant to judgment as a matter of law (i.e., no reasonable jury could find otherwise even when construing the evidence in the light most

favorable to the non-movant), and (2) the non-movant fails to produce sufficient responsive evidence to raise a genuine dispute as to any material fact." Murphy v. Franklin Pierce Law Ctr., 882 F. Supp. 1176, 1180 (D.N.H. 1994)(citing Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993)). Summary judgment will not be granted as long as a reasonable jury could return a verdict in favor of the nonmoving party. Anderson, 477 U.S. at 248.

## Background

In 2000, Berry was working as a consulting partner ("CP") for Ernst & Young U.S., LLC ("E&Y") when E&Y decided to sell its consulting practice to Cap Gemini, S.A. ("Cap"). The entire transaction was outlined in a 580-page "Master Agreement." United States' Motion for Summary Judgment ("U.S. Summ. J."), Ex. 5. The details of the Master Agreement were negotiated by many individuals, including four managing partners of the consulting practice group. As part of the transaction, the CPs would become employees of Cap and would be given shares of stock in Cap in exchange for their interest in E&Y. Pursuant to the Master Agreement, twenty-five percent of the shares received by a CP would be immediately sold to provide funds for the payment of income taxes incurred as a result of the stock transaction. The

remaining seventy-five percent of a CP's shares ("restricted shares") would be placed in an account with Merrill Lynch.  Each participating CP would be required to provide Cap an irrevocable power of attorney with exclusive authority over his or her restricted shares for a period of four years and 300 days, effective May 1, 2000.  During this period, the restricted shares could be sold only under limited circumstances and Cap would authorize the release of the shares in installments.  Some or all of a CP's restricted shares could be forfeited, however, if the CP breached provisions of the documents executed in the E&Y-Cap transaction, voluntarily terminated employment with Cap, or was terminated by Cap "for cause."  U.S. Summ. J., Ex. 13, ¶ 9.

Prior to the closing, E&Y provided the CPs, including Berry, with the Master Agreement, and the "Partner Information Document" ("PID"), which explained the above restrictions, the E&Y-Cap transaction, and the Master Agreement.  U.S. Summ. J., Ex. 9, Ex. 10.  Under the heading "Tax Implications," the PID explained that the transaction would constitute a capital gain reportable on the CP's 2000 federal income tax return and that each CP would be "responsible for paying [his or her] own taxes out of the proceeds allocated to [him or her]; however, [he or she] will receive funds from the sale of Cap Gemini shares for [his or her] tax obligations as they come due."  U.S. Summ. J., Ex. 9, at 18-

4

19.  The PID also provided that the restricted shares would be "calculated at 95 percent of the closing price" of Cap stock on the closing date and that this "will slightly reduce tax due on the Cap Gemini shares received at closing."  Id.  In addition, the PID noted that E&Y, the CPs, and Cap "will treat valuation and related issues consistently for US federal income tax purposes."  Id. at 19.  The PID encouraged the CPs to read the entire document and listed a phone number which the CPs could call with questions.

Approval of the E&Y-Cap transaction required seventy-five percent of the CPs to vote in favor of it.  In March 2000, a meeting was held over a two-day period for the CPs to discuss the proposed transaction.  Prior to this meeting, Berry and the other CPs received a "Partner Transaction Agreement Kit" ("PTAK"), a "Partner Transaction Agreement Signature Document" ("PTASD"), and a "Consulting Partner Transaction Agreement" ("CPTA") (together with the Master Agreement, hereinafter collectively referred to as the "transaction documents").  U.S. Summ. J., Ex. 10, Ex. 12, Ex. 13.  The CPTA provided, in part:  "The parties to [this agreement] are or will be the Firm, Cap Gemini, . . . and each Consulting Partner who executes and delivers a Signature Document and thereby becomes a party to this Agreement.  Each Consulting Partner who becomes a party to this Agreement will thereby become

a party to the Master Agreement."[1]  U.S. Summ. J., Ex. 13, Preamble.

The CPTA further provided:  "You acknowledge your obligation to treat and report the Transaction for all relevant tax purposes in the manner provided in Sections 7.7(f) and (h) of the Master Agreement."  U.S. Summ. J., Ex. 13, ¶ 5(b)(xii).  Section 7.7(f) of the Master Agreement provided that the parties "agree to determine the value of and allocate the total consideration transferred by [Cap] pursuant to this Agreement in accordance with . . . the manner . . . set forth in Schedule 7.7(f) attached hereto," and that such allocation was binding upon the parties.  U.S. Summ. J., Ex. 5, ¶ 7.7(f).  Schedule 7.7(f) provided, in part:  "Notwithstanding any other provision of the Agreement, the parties agree that all [Cap] Ordinary Shares that are not monetized in the Initial Offering will be valued for tax purposes at 95% of the otherwise-applicable market price."  U.S. Summ. J., Ex. 6.

---

[1] The United States acknowledges that the CPTA submitted with its motion is unsigned.  However, in her objection and in her affidavit submitted with her objection, Berry admits to signing the CPTA.  Berry Objection to Plaintiff's Motion for Summary Judgment ("Berry Obj."), ¶ 12; Berry Obj., Ex. 2, ¶2-3.  This fact is thus undisputed.

The CPs ultimately voted ninety-five percent in favor of the E&Y-Cap transaction and Berry received 6,820 shares of Cap stock as a result. Twenty-five percent (i.e., 1,705) of these shares were liquidated to pay for the taxes that Berry would owe as a result of the stock transaction. The remaining seventy-five percent (i.e., 5,115) of the shares were deposited into a Merrill Lynch restricted account in Berry's name.

In 2001, Berry and her husband filed a joint federal income tax return for the tax year 2000. The return showed income of $1,024,511 from the sale of her interest in E&Y. This amount reflects the receipt of the 1,705 Cap shares liquidated at the closing (valued at approximately $265,000) and the receipt of 5,115 Cap shares (restricted shares), which were valued at ninety-five percent of their closing price on the transaction's closing date (approximately $760,000). Berry paid the capital gains tax assessed on this amount.

In 2004, Berry filed an amended joint tax return for the year 2000 for herself and her late husband, reflecting a capital gain of only $264,780 from the E&Y-Cap stock transaction and claiming a tax refund of $156,416. Berry claimed that under the "claim of right" doctrine, her 2000 capital gain should reflect only the twenty-five percent of her 6,820 Cap shares that were liquidated at the closing, since the remaining seventy-five

percent of her shares were restricted and carried "a substantial risk of forfeiture."  U.S. Summ. J., Ex. 4, at 3.  On June 9, 2004, the IRS issued Berry a refund for $204,695.48, which included the $156,416 in taxes Berry paid in 2000, plus interest.  The United States instituted the present action in 2006, seeking to recover the $204,695.48 paid to Berry, plus accrued interest.

## Discussion

The United States seeks recovery of the refund issued to Berry pursuant to 26 U.S.C. § 7405(b) which provides, in relevant part:  "Any portion of a tax imposed by this title which has been erroneously refunded . . . may be recovered by civil action brought in the name of the United States."  The United States bears the burden of showing that the refund issued to Berry is erroneous.  United States v. Commercial Nat'l Bank, 874 F.2d 1165, 1169 (7th Cir. 1989).

### A.  "Strong Proof" Rule

The United States contends that there is a legal presumption that Berry is bound by the tax treatment of the stock transaction in the original transaction documents.  The United States argues that Berry cannot overcome this presumption, which requires "strong proof" of a contrary intention of the parties.  See

Leslie S. Ray Ins. Agency, Inc. v. United States, 463 F.2d 210 (1st Cir. 1972); Harvey Radio Laboratories, Inc. v. Commissioner, 470 F.2d 118 (1st Cir. 1972). Berry counters that the United States's reliance upon Leslie S. Ray and Harvey Radio is misplaced because the principles enunciated in those cases apply only when a taxpayer (1) is a party to the agreement at issue, (2) affirmatively agrees to the structure of the deal, and (3) later attempts to vary that structure.[2]

The First Circuit first outlined the "strong proof" rule in Leslie S. Ray: "the allocation in the agreement [of the parties in the sale of a going business] presumptively controls the tax consequences of the purchase, [however], the parties may overcome the presumption by 'strong proof' that at the time of execution of the contract, it was the intention of the parties to allocate a different amount." Leslie S. Ray, 463 F.2d at 212. The court explained that this "means that a taxpayer may vary the allocation stated, or implicit, in the agreement by, but only by, establishing that the parties, who have competing tax interests

---

[2] Berry also argues that the United States cannot rely upon Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), for the same reasons. The United States, however, does not rely upon Danielson in its motion. In any event, Danielson is not applicable as the First Circuit has declined to adopt the rule in Danielson in favor of the "strong proof" rule. Harvey Radio, 470 F.2d at 120.

9

in the matter, agreed on a different figure when they signed the contract." Id. The First Circuit expressly adopted the "strong proof" rule in Harvey Radio. Harvey Radio, 470 F.2d at 119-120.

The undisputed facts show that the "strong proof" rule is appropriately applied to Berry. First, the CPTA document explicitly made Berry a party to the E&Y-Cap agreement and stock transaction. U.S. Summ. J., Ex. 13, Preamble ("Each Consulting Partner who becomes a party to this Agreement will thereby become a party to the Master Agreement.") As a result of the transaction Berry received, and accepted, 6,820 shares of Cap stock. She is, therefore, a party to the agreement for purposes of the application of the "strong proof" rule.

Second, Berry "affirmatively" agreed to the terms of the agreement by signing the transaction documents and accepting the Cap stock. She contends that despite her signature, she was merely a "third party" to the transaction with no real bargaining power who was offered a "take it or leave it" deal. Berry Obj., at 15. In her affidavit, she also claims: "I did not believe that I had any choice but to sign the noted documents if I wanted to avoid a negative impact on my employment with [Cap]." Berry Obj., Ex. 2, ¶ 3.

The undisputed facts belie her claim that she was a third party with no bargaining power. Several partners from Berry's

consulting practice group directly participated in the stock transaction negotiations on behalf of all of the CPs, including Berry. All CPs were invited to participate in the two-day meeting held in March 2000 to discuss the proposed transaction. After the meeting, each CP was given a paper ballot on which he or she could privately vote for or against the transaction. Persons who could not attend the meeting were able to participate by phone or computer. Approval of the transaction required at least a seventy-five percent favorable vote by all CPs. The CPs voted ninety-five percent in favor of the transaction. Berry does not claim that she was not at the March 2000 meeting, or that she voted against the transaction. The involvement of the negotiating partners, Berry's opportunity to participate in the March 2000 meeting, and her ability to vote all show that Berry was a party to the transaction with bargaining power. Berry presents no evidence to the contrary and thus has failed to present a genuine issue of material fact on this issue.

   Further, Berry's affidavit does not contain specific facts based upon personal knowledge to support her claim that her employment would be negatively affected if she declined to sign the agreement. Berry has provided no evidence, nor does she claim, that she was threatened with termination should she attempt to negotiate the terms of the stock transaction. <u>See</u>

United States v. Fletcher, No. 06-C-6056, 2008 WL 162758 (N.D. Ill. Jan. 15, 2008) (in similar case involving same E&Y-Cap transaction and a CP, finding insufficient evidence of duress where CP offered no evidence that she was threatened with termination).  Rather, she asserts her belief that she had no choice but to sign the agreement.  Her statement of belief cannot be considered an assertion of fact for purposes of summary judgment.  See Quinones v. Houser Buick, 436 F.3d 284, 291 (1st Cir. 2006) ("Without first-hand knowledge of facts supporting his allegations, [the plaintiff] could not simply testify to a belief.").

   Therefore, there is a lack of competent evidence of record to support Berry's claim that she did not affirmatively agree to the transaction.  Further, neither party disputes that Berry is now attempting to alter the terms of the E&Y-Cap transaction.  The "strong proof" rule discussed in Leslie S. Ray and Harvey Radio is therefore applicable.

B.   Enforceability of the E&Y-Cap Agreement

   Alternatively, Berry contends that even were the "strong proof" rule applicable, a genuine issue of material fact exists as to whether the transaction documents are enforceable because the E&Y-Cap transaction constitutes a contract of adhesion.  The

12

United States responds that a contract of adhesion is not a basis to avoid the tax consequences of the transaction and that Berry cannot prove that the transaction was a contract of adhesion.

The First Circuit has not expressly decided whether the tax treatment of a transaction expressed in a contract of adhesion can be enforced. In Leslie S. Ray and Harvey Radio, the focus was upon the intent of the contracting parties, and the court had no occasion to decide this issue. Even assuming that the tax treatment in a contract of adhesion is not enforceable, Berry has failed to allege facts sufficient to show a triable issue regarding whether the E&Y-Cap transaction is an unenforceable contract of adhesion.

A contract of adhesion is a "contract[] formed with the use of standard form documents [where] [t]he party that prepared the contract[] typically approaches the potential contractual relationship with a take-it-or-leave-it posture." Kristian v. Comcast Corp., 446 F.3d 25, 32, n.2 (1st Cir. 2006). Under New Hampshire law, a contract of adhesion is unenforceable if it is unconscionable and oppressive. See PK's Landscaping v. New Eng. Tel. & Tel. Co., 128 N.H. 753, 755 (1986); see also Mills v. Nashua Fed. Sav. & Loan Ass'n, 121 N.H. 722, 726 (1981) ("Absent evidence to the contrary, . . . [the] agreement entered into between [the parties] is presumed to have resulted from a mutual

meeting of the minds and constitutes a legally enforceable contract."). The New Hampshire Supreme Court has stated that unconscionability "include[s] an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." <u>Pittsfield Weaving Co. v. Grove Textiles</u>, 121 N.H. 344, 346 (1981). The court further added in <u>Pittsfield Weaving</u> that "[t]he existence of gross inequality of bargaining power is also a factor to be considered." <u>Id.</u>

As the party bearing the burden of proof on the unenforceability issue, Berry must submit "definite, competent evidence" to support her claim that the E&Y-Cap transaction is a contract of adhesion. <u>Kearney v. Town of Wareham</u>, 316 F.3d 18, 22 (1st Cir. 2002). In addition, she cannot rely on speculation or conjecture and must present "more than a mere scintilla of evidence in [her] favor." <u>Invest Almaz v. Temple-Inland Forest Prods. Corp.</u>, 243 F.3d 57, 76 (1st Cir. 2001) (internal quotation omitted).

To support her contract of adhesion claim, Berry submitted her affidavit, an expert report from Michael Losapio ("Losapio Report"), a certified public accountant and valuation analyst, and Losapio's affidavit. In her affidavit, as discussed above, she states that she "did not believe" that she had any choice but

14

to sign the transaction documents in order to "avoid a negative impact" on her employment with Cap and that she "did not have any ability to negotiate . . . and in fact did not negotiate" the terms of the E&Y-Cap transaction.  Berry Obj., Ex. 2, ¶¶ 3, 5.  The Losapio Report discusses the value of Berry's restricted shares, concluding that the shares should have been valued at fifty-five percent, not ninety-five percent, of their freely traded market value.

   This evidence fails to show a genuine issue of material fact regarding the enforceability of the E&Y-Cap transaction.  First, Berry does not assert that the transaction involved the type of "standard form documents" characteristic of a contract of adhesion.  See Kristian, 446 F.3d at 32.  Second, Berry has failed to present any competent evidence that the E&Y-Cap transaction was presented to her on a "take it or leave it" basis, that she was given no meaningful choice, or that there was a gross inequality of bargaining power.  As discussed above, a favorable vote from seventy-five percent of the CPs, of which Berry was one, was needed to approve the transaction.  Partners from the consulting group were part of the negotiations on behalf of the other CPs.  A two-day meeting was held for all CPs to discuss all aspects of the transaction.  Berry presents no evidence to rebut these facts.

Finally, Berry has presented no competent evidence to show that the terms of the transaction were unreasonably favorable to E&Y or Cap.  Even accepting the fifty-five percent valuation in Losapio's report, this alone does not show that the ninety-five percent valuation in the transaction was unreasonably favorable to E&Y or Cap over her.  Berry has failed to submit competent evidence that the E&Y-Cap transaction was a contract of adhesion.  Therefore, the transaction documents are enforceable against Berry.

## C.   Application of the "Strong Proof" Rule

Given the applicability of the "strong proof" rule, the issue on summary judgment is whether the ninety-five percent valuation for Berry's restricted shares specified in the transaction documents controls the tax consequences of the stock transaction.  The parties do not dispute that the transaction documents specified that the restricted shares would be valued at ninety-five percent of their closing price on the transaction's closing date for federal income tax purposes.  This valuation presumptively controls the tax treatment of the stock transaction unless there is "strong proof" that at the time of the agreement the parties intended a different valuation.  See Leslie S. Ray, 463 F.2d at 212.

Berry does not argue that a different valuation was intended.  Rather, she contends that she should have been taxed based upon the "actual value" of her restricted shares, which she contends was fifty-five percent of its open market value at the time of closing.[3]  Berry Obj., at 10.  Under the "strong proof" rule, however, the actual value of the stock is irrelevant.  Rather, it is the value assigned to the stock in the transaction documents that controls, unless there is "strong proof" that the parties <u>intended</u> to assign a different value.  Leslie S. Ray, 463 F.2d at 212.  Since nothing has been submitted on summary judgment to indicate that a different valuation was intended by the parties, the ninety-five percent valuation assigned to the restricted stock in the transaction documents "controls the tax consequences" of the stock transaction.  <u>Id.</u>

Therefore, the United States has produced sufficient evidence to establish that Berry is bound by the ninety-five percent valuation of her restricted stock, and Berry has failed to produce sufficient responsive evidence to raise a genuine dispute as to any material fact on this issue.  The evidence is thus conclusive that the United States erroneously issued Berry a

---

[3] The United States correctly points out that this argument is inconsistent with Berry's amended 2000 tax return where she claimed the restricted shares should not have been taxed at all because she realized no long-term capital gain from them in 2000.

refund in the amount of $204,695.48.  The United States is entitled to judgment against Berry for this amount, plus accrued interest as allowed by law from June 9, 2004.

## Conclusion

For the foregoing reasons, the United States's motion for summary judgment (document no. 13) is granted.  The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

                                              Joseph A. DiClerico, Jr.
                                              United States District Judge

October 2, 2008

cc:   Thomas P. Cole, Esquire
      Steven J. Dutton, Esquire
      Scott H. Harris, Esquire
      Karen A. Smith, Esquire